IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| JOHN GILLIS, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:07-CV-500-Y |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER</u>

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

<u>FINDINGS AND CONCLUSIONS</u>

A.     STATEMENT OF THE CASE

Plaintiff John Gillis brings this action pursuant to Section 405(g) of the Social Security Act, Title 42 of the United States Code, for judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act. Gillis applied for disability benefits in October 2003, alleging disability commencing June 2, 2002. (Tr. 61, 76). He met the insured status requirements at all times relevant to the administrative decision. (Tr. 64).

The Social Security Administration denied Gillis's application for benefits both initially and

on reconsideration, and Gillis requested a hearing before an administrative law judge (the "ALJ"). ALJ James A. Wendland held a hearing on April 11, 2005. (Tr. 429). On July 29, 2005, the ALJ issued a decision that Gillis was not disabled because he had the residual functional capacity (RFC) to perform a modified range of sedentary work, including work existing in significant numbers in the national economy. (Tr. 15-24). The Appeals Council denied Gillis's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled and entitled to benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be working at a level of substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. *Id*. § 404.1527. Second, the claimant must have a severe impairment or combination of impairments. *Id*. § 404.1520(c). Third, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of a listing alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th

Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* Conflicts in the evidence are for the Commissioner and not the court to resolve. *Masterson*, 309 F.3d at 272. The court will not re-weigh evidence, try questions *de novo,* or substitute its judgment for the Commissioner's, even if the court believes the evidence weighs against the Commissioner's decision. *Id.*; *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.  ISSUE

Whether the ALJ's stated reasons for rejecting the testimony of the non-examining medical expert are supported by substantial evidence.

D.  ADMINISTRATIVE RECORD

   1.  Medical and Vocational History

Gillis was born August 7, 1961. (Tr. 76). He graduated high school and has two years of vocational training in engine repair. (Tr. 73, 312). Gillis worked for ten years as a vocational education instructor in small-engine repair. He also worked part-time as a mechanic, repairing lawn and garden equipment. (Tr. 79-81, 452).

Gillis injured his low back while working in 1993. (Tr. 111). He ruptured two discs, requiring surgery, but recovered and returned to his job as an instructor. (Tr. 130). In 2001, he had a recurrence of back and left leg pain. Magnetic resonance imaging (an MRI) showed a recurrent disc herniation at L4-5. (Tr. 128). On June 11, 2001, Gillis underwent a repeat laminectomy and diskectomy at L4-5 with a posterior lumbar fusion.[1] (Tr. 128-135). Gillis attended two months of rehabilitation and returned to work after this surgery as well. (Tr. 70, 79).

Gillis complained of right shoulder pain in August 2001, and diagnostic findings were consistent with a rotator cuff tear. (Tr. 213-217). In February 2002, he was in a car accident, which aggravated his back and shoulder pain and strained his neck. (Tr. 236-244). Gillis had surgery on his right shoulder on July 1, 2002, which succeeded in relieving his shoulder pain. (Tr. 156, 432-33).

Gillis went to the emergency room in August 2002 after falling and injuring his back. He was treated with intravenous pain medication and discharged. (Tr. 222-32). Gillis subsequently

---

[1] A laminectomy is the surgical excision of the posterior arch of a vertebra. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1017 (31st ed. 2007). A diskectomy refers to surgical excision of an intervertebral disc. *Id*. at 553.

sought treatment for chronic low back pain with pain management specialist Abdul Itani, D.O. On October 15, 2002, Gillis complained of pain, stress, and depression. His mother had died a few days earlier. (Tr. 290). Itani prescribed Oxycontin at a dose of 120 milligrams daily for back pain and an antidepressant. Itani later added two muscle relaxers to Gillis's medication regimen. (Tr. 289). At a follow-up appointment in December, Gillis reported no side-effects from his medication, but he was experiencing a lot of breakthrough pain.[2] (Tr. 288). Itani increased Gillis's dosage of Oxycontin. In December 2002, Gillis complained to his primary care physician, Melissa Benavides, M.D., that his pain was not adequately controlled and he was becoming increasingly depressed. Gillis had an appointment scheduled with a psychiatrist, but Benavides recommended that he move up his appointment. (Tr. 304).

At Gillis's appointment on January 13, 2003, Itani noted that Gillis was showing some improvement and was starting a new job on Monday. (Tr. 287). Benavides's treatment notes from February 6, 2003, also refer to Gillis starting a new job. Gillis had run out of pain medication, but had an appointment with his pain management specialist the next day. Benavides refilled Gillis's prescriptions for antidepressants. (Tr. 296, 300). Benavides also noted that Gillis was seeing a psychiatrist, although no psychiatric reports are part of the administrative record.

On March 7, 2003, Gillis rated his pain level as a 6 or 7 out of 10. He reported no side-effects from his medication. He had lost weight and was exercising. (Tr. 285). On March 31, 2003, Gillis complained of severe pain after twisting his back at work. (Tr. 282). Itani prescribed treatment with a muscle stimulator. (Tr. 283-84). On April 21, 2003, Gillis still had some

---

[2] Breakthrough pain is a transient increase in pain intensity. *Id*. at 1384.

depression and decreased motivation, and he had lost his new job. (Tr. 296).

In May 2003, Gillis complained of increased pain. He was agitated and depressed. Itani increased Gillis's dosage of Oxycontin to 160 milligrams daily, prescribed the sleep aide Ambien, and ordered magnetic resonance imaging (an MRI). (Tr. 279). The 2003 MRI showed degenerative changes at L5-S1 with no significant annular bulge or herniation. The fusion was in position with no stenosis apparent at that level. (Tr. 277-278). Itani recommended water therapy, changed Gillis's muscle relaxants, and prescribed an antidepressant. (Tr. 276A).

At a July office visit, Gillis was described as very depressed. Itani increased Gillis's prescription for muscle relaxers and recommended a psychiatric consultation. (Tr. 275-76). Gillis also saw Benavides in July. He complained of sciatica and muscle spasms, and was unable to sit or stand for prolonged periods. His depression was under fair control with medication. (Tr. 292). Itani stressed in August 2003 that Gillis needed to see a psychiatrist and increased Gillis's antidepressant and Oxycontin. (Tr. 274). In September, Gillis reported some back pain, but overall, his medications were effective. (Tr. 273).

Gillis underwent a consultative psychological evaluation with Betty Eitel, Ph.D., on December 4, 2003. (Tr. 311-314). Gillis attributed his depression to his chronic pain and inability to work. Gillis's symptoms included hopelessness, helplessness, overeating, difficulty sleeping, a lack of pleasure from activities he used to enjoy, social isolation, and a sad mood. He reported being mildly depressed for most of his life. (Tr. 311). Gillis walked with a cane and was in noticeable pain. (Tr. 311).

Gillis relied on friends and family for transportation. He knew how to drive, but was afraid

to drive because of his medications. He performed little housework, but completed most personal hygiene tasks independently. (Tr. 311). Gillis watched television and was able to recount recent news stories for the examiner. Gillis reported that he was forgetful and had difficulty concentrating. He cared for his father, who had suffered a stroke and lived nearby. (Tr. 312). He reported that his childhood was hard and he had been alone most of the time. He made good grades in high school and was on the dean's list when he attended college. He taught engine repair at the community college for ten years, but quit because of pain. (Tr .312).

On examination, Gillis exhibited a depressed mood with appropriate affect. Eitel noted that he cried easily when talking about his loss of work and chronic pain. (Tr. 313). His thought process was logical and appropriate. Gillis was unable to remember any of four words presented after a five-minute delay unless prompted. He was able to name the current and most recent Presidents, and he repeated six digits forward and four digits in reverse without error. He could not perform serial seven subtractions, but he was able to count backwards from 100 by fives. His ability for abstract thinking was rated as above-average. (Tr. 313).

Eitel diagnosed a dysthymic disorder; major depressive disorder, single episode, severe without psychotic features; and pain disorder. (Tr. 313). She assigned a Global Assessment of Functioning (GAF) score of 40 and a guarded prognosis.[3] (Tr. 314).

By January 2004, Itani had increased Gillis's Oxycontin dosage to 240 milligrams per day

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994)(DSM-IV). A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.* at 34.

and suggested that Gillis consider implantation of a morphine pump. (Tr. 376). In March 2004, Itani reported that Gillis' low back pain was becoming refractory to pain medication. In addition to continuing the Oxycontin, Itani provided samples of the anti-inflammatory Mobic and prescribed a new muscle relaxant. (Tr. 373-74).

Gillis asked Benavides to provide a statement of medical necessity to enable him to access his IRA, and Benavides issued a statement on March 1, 2004 in which she opined that Gillis had difficulty meeting his financial obligations because his chronic back pain precluded him from working. (Tr. 355). On March 30, 2004, Gillis complained of an electrical sensation in his left leg accompanied by weakness and occasional numbness. (Tr. 353). His depression was improved. The antidepressant caused headaches, but they were decreasing in frequency. (Tr. 353). A repeat MRI on April 14, 2004 showed no evidence of stenosis throughout the lumbar spine, including the surgical levels, with mild facet hypertrophy at L4-L5 and L5-S1. (Tr. 351-52). . Itani performed two caudal epidural blocks to alleviate the electrical sensation that Gillis was experiencing down his left leg. (Tr. 369, 371-373).

At his April 30, 2004 appointment with Benavides, Gillis had lumbar muscle spasms and was very depressed. He had not refilled his medications. He had learned that he was losing his job in two weeks. (Tr. 348). He was moody, thought of hurting himself, and felt like he was having a nervous breakdown. His wife was concerned about his behavior and addiction to pain medication. Benavides recommended an immediate psychiatric evaluation, restarted Gillis on antidepressants, and assigned a strict pain medication schedule. (Tr. 348). She also set a date for Gillis to quit smoking, which he did. (Tr. 340).

Itani prescribed new medication in July 2003 for Gillis's nighttime breakthrough pain. (Tr. 368). Gillis was also scheduled to try a morphine catheter. Itani reported in August 2003 that Gillis had taken a Minnesota Multiphasic Personality Inventory ("MMPI") and was cleared for his morphine catheter trial. (Tr. 367). In September 2003, Gillis proceeded with the morphine catheter trial, but the morphine pump failed to provide him with good pain relief. (Tr. 364-366). Because Gillis reported a significant amount of breakthrough pain despite medication compliance, Itani recommended a narcotic holiday. (Tr. 364).

Itani initiated a narcotic holiday in November 2004, discontinuing Gillis's use of Oxycontin and prescribing different pain medication. (Tr. 363). After one week on the new medication, Gillis complained of headaches, dizziness, and nausea. Itani resumed Gillis' treatment with Oxycontin, 240 milligrams daily. (Tr. 362). On December 7, 2004, Gillis was depressed about his condition. Gillis rated his pain at 7 out of 10 and was taking his Oxycontin as directed without side effects. Itani made no changes to Gillis's treatment regimen, but recommended that he see a psychiatrist. (Tr. 360). Itani continued to see Gillis on a monthly basis in 2005. (Tr. 384-391).

Gillis began treatment with a clinical psychologist, Dana Turnbull, Ph.D., in March 2005 and had attended two sessions with Turnbull before the administrative hearing. Turnbull diagnosed a depressive disorder and a pain disorder associated with a medical condition. (Tr. 377-78). On June 14, 2005, Turnbull completed an assessment of Gillis's mental functioning. She found Gillis had poor ability to remember locations and work-like procedures; understand and remember detailed instructions; maintain regular attendance; carry out detailed instructions; sustain attention and concentration for two-hour periods; work in coordination or proximity to others without being

unduly distracted; complete a normal workday without interruption from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; perform activities within a schedule; adapt to changes in work setting; be aware of normal hazards and take precautions; travel in unfamiliar places; or set realistic goals and make plans independently of others. (Tr. 421-22). Gillis had a good ability to understand, remember and carry out simple instructions; make simple work-related decision; get along with others; and accept instructions and criticism from supervisors. (Tr. 421-22). However, Turnbull advised that Gillis could be expected to miss work more than three days a month due to mental illness. Turnbull opined that Gillis had been under these restrictions since 2002, and she did not anticipate any improvement in Gillis's condition until his pain was appropriately treated. (Tr. 423).

At Itani's request, Gillis underwent a functional capacity evaluation in May 2005 with occupational therapist Andrew Robinson. (Tr. 399- 405). Gillis's gait was antalgic and he had restricted range of motion in his lumbar spine. His performance during testing was inconsistent and he exhibited self-limiting behaviors. (Tr. 403). He was able to lift and carry ten pounds, frequently sit and stand (defined as up to five and a half hours), walk on an occasional basis, and occasionally climb stairs, balance, stoop, or crouch. (Tr. 400). Robinson concluded that Gillis was capable of sedentary work and could be expected to tolerate five or six hours of sitting and three or four hours of standing and walking during an eight-hour workday. (Tr. 399, 405).

Itani prepared a written report dated May 13, 2005, in which he stated that he was treating Gillis for low back pain and post laminectomy syndrome. (Tr. 380). Gillis's objective signs of pain included muscle spasms and restricted range of motion. Itani opined that Gillis could occasionally

lift six to ten pounds; sit for thirty minutes at a time, for a total of five or six hours per day; and stand or walk for three or four hours per day.[4]  (Tr. 381-82).

2. Administrative Hearing

Gillis testified that he had worked as a coordinator and full-time instructor in small engine repair, but pain prevented him from performing that job. (Tr. 433).  Gillis also testified that he did not start a new job in January or February 2003.  One of his former student had started a lawn equipment repair business and had offered him a job, but he declined the job because he could not perform the heavy lifting required. (Tr. 434–36).

Gillis testified that he was depressed because he did not feel useful.  (Tr. 438).  He isolated himself, avoiding family and social functions.  He had mood swings and nothing was fun for him anymore.  He occupied himself during the day by watching television, but had to elevate his legs after thirty minutes or an hour of sitting.  (Tr. 438).  He did light housework and prepared simple meals.  He estimated that he could stand for thirty or forty-five minutes, but would need to lie down for two or three hours afterwards because of pain in his low back and left leg.  (Tr. 439).  He occasionally visited his father, who lived a few houses away from him, but he had to drive his car because he could not walk that distance.  (Tr. 440).  His medications caused decreased sex drive, dizziness, fatigue, and stomach problems.  (Tr. 441).  He estimated that he had two good days a week.  (Tr. 442).  He napped during the day because he did not sleep well at night.

---

[4] The form Itani completed also asked him to select the total amount of time that Gillis could reasonably be expected to sit, stand or walk during a standard workday from the following choices: less than two hours, two to three hours, three to four hours, or five to six hours. (Tr. 382).  Gillis points out that Itani checked the choice of five to six hours, i.e., less than a full workday, but the court notes that the form did not give Itani any choices greater than five to six hours.  Conversely, Itani's assessment of Gillis's ability to sit for up to six hours and stand for up to four hours is compatible with an eight-hour workday.

Medical expert Ollie Raulston testified that he had reviewed Gillis's surgical history and chronic pain complaints. Raulston found that Gillis had no impairment meeting or equaling a listing, but opined that Gillis's pain and depression in combination have prevented him from working since June 2002 to the present. (Tr. 446-47). He had no objective test results or physical findings that showed the source of Gillis's pain, but explained that chronic pain can become psychologically induced in part. (Tr. 448).

Vocational expert Carol Bennett testified that work as a small engine mechanic was skilled work requiring medium exertion. Vocational instruction was also skilled work that usually required light exertion, but Gillis's job as he performed it had required heavy exertion. (Tr. 452). The ALJ asked Bennett to consider a hypothetical:

> A person 43 years of age with a high school level of education, same past work experience as the claimant, ability to do sedentary work with the following specific restrictions and requirements. Now in regard to stoop or balance, crouch, crawl, kneel or climb stairs and ramps, more than occasionally. Not require to climb scaffolds, ladders and ropes. Not required to sit without the opportunity to occasionally stand in addition to the lunch and normal legal breaks during the work day. Not required to walk for more than five minutes at one time without the opportunity to sit. Not require to stand for more than 30 minutes at one time without the opportunity to sit. Not required to push or pull with the feet. Not required to work at unguarded heights or near unguarded hazardous, mechanical equipment. Not required to maintain fixed concentration and attention for periods of longer than 30 minutes without the opportunity to briefly refocus for a minute or two and come back to fixed concentration. Not required to understand, remember and carry out more than simple instructions. Not required to have more than superficial interaction of coworkers or the public.

(Tr. 453). Bennett testified that there would be sedentary, unskilled work available with numbers reduced to reflect the siting and standing restrictions. Examples included small parts assembler, with 140,000 jobs nationwide; inspectors, with at least 40,000 jobs in the nation; and graders and

sorters, with at least 22,000 jobs nationwide. She affirmed that none of her testimony conflicted with the Dictionary of Occupational Titles. (Tr. 454). Bennett also testified that employers would not tolerate absences of three days a month for an ongoing period. (Tr. 456).

  3. ALJ Decision

The ALJ found that Gillis had not engaged in substantial gainful work activity since June 2, 2002, although there was some evidence that he had worked in early to mid-2003. The ALJ further found that Gillis's severe impairments included post-laminectomy syndrome; obesity; depression, a pain disorder, and nicotine abuse. The ALJ found no impairment or combination of impairments meeting or medically equaling a listed impairment. (Tr. 16). The ALJ also rejected Raulston's opinion that Gillis was disabled by the combined effects of chronic pain and depression. The ALJ found that Gillis retained the residual functional capacity for the exertional requirements of sedentary work, modified by the same restrictions presented to the vocational expert at the hearing. (Tr. 21). The ALJ noted that Gillis's past relevant work would be precluded, but based on the vocational expert's testimony, found a significant number of jobs existed in the national economy that Gillis could perform. (Tr. 24). Accordingly, the ALJ concluded that Gillis was not disabled and was not eligible for disability insurance benefits. (Tr. 24).

E. DISCUSSION

Gillis contends that the ALJ's stated reasons for rejecting Raulston's opinion are unsupported by substantial evidence. An ALJ may request the assistance of a medical expert, also referred to as a medical adviser, when evaluating the nature and extent of a claimant's impairments. *Richardson v. Perales,* 402 U.S. 389, 408, 91 S.Ct. 1420, 1430-1431, 28 L.Ed.2d 842 (1971). A medical expert

(ME) is a neutral consultant who reviews a claimant's medical records, explains or clarifies information reflected therein, and expresses expert opinions as to the nature and severity of impairments and whether impairments equal the requirements of any impairment listed in Appendix 1 following the disability regulations. *See* 20 C.F.R. § 404.1527(f)(2)(iii); SOCIAL SECURITY RULING 96-6p. When an ALJ considers an ME's opinions, he must evaluate them using the rules set forth in the regulations for considering any medical opinion. *See generally* 20 C.F.R. § 404.1527(a)-(e). The ALJ may not ignore opinions from program physicians and must explain the weight given to these opinions in his decision. SOCIAL SECURITY RULING 96-6p.

The ALJ asked Raulston, a board-certified orthopedic surgeon, to testify as an ME at Gillis' April 2005 hearing. (Tr. 50, 56). Raulston opined that Gillis had been unable to perform gainful activity since June 2, 2002 through the present time given the combination of depression and pain he was experiencing. When pressed by the ALJ about the existence of objective evidence of the source of Gillis's continued back pain, Raulston was unable to identify any objective test results or physical findings. (Tr. 448). Instead, Raulston speculated that the fusion was not solid or that there was a psychological component, explaining that chronic pain could become psychologically induced, which in turn worsened Gillis's psychological condition. (Tr. 448). Citing Raulston's opinion, the ALJ found at Step Three of the sequential evaluation process that Gillis' impairments do not meet or equal the severity of any listed impairment, (Tr. 19), but at Step Four, the ALJ did not adopt Raulston's opinions about Gillis's inability to work. (Tr. 17, 22).

Gillis contends that the ALJ's reasons for rejecting Raulston's opinion are not well founded. The ALJ is responsible for assessing the credibility of medical experts as well as lay witnesses and

weighing their opinions accordingly. *Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994). *See also* SOCIAL SECURITY RULING 96-5p, 96-6p. When good cause is shown, less weight, little weight, or even no weight may be given to the opinion. *Greenspan,* 38 F.3d at 237. The ALJ explained that he found Raulston's opinion was inconsistent with the remainder of the record and Raulston's own testimony in which he could cite no objective findings substantiating the severity of Gillis's back complaints. (Tr. 17). *See* SOCIAL SECURITY RULING 96-6p (noting that opinions of program physicians can be given weight only insofar as supported by the evidence, considering factors such as the consistency of the opinion with the record as whole). The ALJ also addressed the concern that Gillis's medication regimen interfered with his ability to work, but gave controlling weight to Itani's treatment records, which consistently documented functional status and the lack of any medication side-effects. (Tr. 17). The ALJ assigned significant weight to the functional capacity evaluation, as referenced by Itani, which was compatible with the requirements of sedentary work.[5] (Tr. 17, 22). Gillis contends that the ALJ's reasoning is flawed because Raulston's opinion is consistent with the ALJ's determination that Gillis's back impairment was severe and that the medical record substantiated objective findings that could reasonably be expected to produce the

---

[5] Gillis contends that the functional capacity evaluation was performed by an occupational therapist, who is not an acceptable medical source and cannot offer a medical opinion. "Acceptable medical sources" refer to licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists, who may address matters within their area of training. *See generally* 20 C.F.R. § 404.1513(a). The distinction between "acceptable medical sources" and other healthcare providers is important because only acceptable medical sources can establish the existence of a medically determinable impairment; offer a medical opinion; or be a qualified treating source whose medical opinion may be entitled to controlling weight. SOCIAL SECURITY RULING 06-03p. Information from other sources, however, may provide insight into the severity of an impairment and how it affects the individual's ability to function. *Id.* It was permissible for the ALJ to use the functional capacity evaluation as evidence of Gillis's abilities. Moreover, Itani is a treating physician and offered a similar assessment of Gillis's functional abilities. (Tr. 380). Although Gillis suggests that the ALJ did not rely on Itani's opinion as a basis for rejecting Raulston's opinion, the ALJ repeatedly stated that he was giving significant weight to Itani's treatment notes and Exhibit 14F, which contains Itani's opinion and the functional capacity evaluation that Itani ordered.

symptoms alleged. (Tr. 19). The ALJ's finding of severity at Step Two of the sequential evaluation process does not undermine the reasons he gave for disagreeing with Raulston's testimony that Gillis's impairments are disabling in degree. And in assessing Gillis's credibility, the ALJ agreed that there were sufficient objective medical findings that could reasonably expected to produce the subjective symptoms that Gillis reported, but the ALJ also found that the severity of the symptoms reported was not reasonably supported by the medical evidence. (Tr. 19-20). Although the ALJ did not find Gillis's complaints entirely credible, the ALJ did not ignore the limitations imposed by Gillis's physical or mental impairments, but accounted for these impairments in restricting Gillis to a modified range of sedentary work. The ALJ's reasoning is not inherently contradictory.

Gillis also asserts that Raulston's opinion is consistent with the diagnoses of depression and a pain disorder. The ALJ agreed that Gillis's depression and pain disorder constituted severe impairments; however, disability depends on the effect these impairments have on Gillis's functioning. The ALJ reviewed Gillis's consultative mental evaluation and found it reflected minimal impairment, and also observed that Gillis had made a satisfactory score on the MMPI that cleared him for the trial of a morphine pump.[6] (Tr. 18). The ALJ considered Turnbull's post-hearing assessment of significant work-related mental limitations, but found these opinions were inconsistent with the remaining record and not substantiated by a mental status evaluation or objective findings. The ALJ further found that Gillis's depression was situational, and when

---

[6] Gillis criticizes the ALJ for rating his performance on the MMPI as "satisfactory" because the test results s are not included in the record. A fair reading of the decision indicates that the ALJ was drawing a reasonable inference that Gillis's score–although unspecified–was sufficiently high that he was deemed eligible to participate in the morphine catheter trial.

symptomatic, was controllable with medication. (Tr. 18). Overall, the ALJ assessed mild restriction in Gillis's activities of daily living; moderate impairment in social functioning; moderate difficulty maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr.18). Although the ALJ acknowledged that Gillis's depression and pain disorder were severe, the ALJ found that Gillis's impairments could be accommodated by work with limited periods of concentration, simple instructions, and no more than superficial interaction with co-workers or the public, and that assessment has substantial evidence to support it.

Gillis asserts that the ALJ failed to analyze the cumulative impact of his severe impairments before rejecting the ME's opinion about the synergistic effects of chronic back pain and mental depression. In determining whether an individual's physical or mental impairments are of sufficient medical severity to be the basis of disability, the Commissioner considers the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. 20 C.F.R. § 404.1523. The cumulative, or synergistic, effects of multiple impairments may be disabling even when each individual impairment considered in isolation would not be. *See DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983). But here, the ALJ did not so fragmentize his consideration of Gillis's multiple impairments that the court is persuaded that he failed to properly analyze their combined impact. *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985). The ALJ expressly stated that he found no impairment or combination of impairments meeting or equaling a listing. He did not expressly state that the RFC assessment similarly represented the combined impact of Gillis's impairments, but the detailed nature of that assessment reflects that he considered all of Gillis's impairments in assessing Gillis's credibility and

level of functioning.

Gillis also contends that no medical source except Raulston has offered an opinion on the cumulative effect of his chronic back pain and depression, but the absence of such a statement does not make the record incomplete. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995). Instead, the court must consider whether the Commissioner's decision is supported by substantial evidence in the existing record. *Id*. As the Commissioner notes, Gillis's treating pain management specialist was familiar with Gillis's symptoms but still opined that Gillis was capable of sedentary work. The ALJ also relied on the lack of an objective basis for Gillis's complaints, Gillis's daily activities, and multiple reports in the treatment records that Gillis worked for some period in 2003. The ALJ incorporated Gillis's physical and mental impairments in the RFC assessment to the extent he found limitations supported by the record, and the ALJ's determination that Gillis is not disabled because he is capable of performing work existing in significant numbers in the national economy is supported by substantial evidence.

The ALJ's decision reflects that he gave appropriate consideration to Raulson's opinion that Gillis was disabled, but ultimately rejected that opinion based on articulated reasons that are supported by substantial evidence. Gillis has not demonstrated that the Commissioner reached a decision that is either unsupported by substantial evidence or contrary to law.

## RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED

## FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until November 19, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until November 19, 2008, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of

the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED OCTOBER 29, 2008.


    /s/    Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE